# United States Court of Appeals
## For the First Circuit

No. 13-2075

UNITED STATES OF AMERICA,

Appellee,

v.

CHRISTOPHER MULLINS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Lynch, Chief Judge,
Stahl and Kayatta, Circuit Judges.

William S. Smith for appellant.
Seth R. Aframe, Assistant United States Attorney, with whom John P. Kacavas, United States Attorney, was on brief, for appellee.

February 4, 2015

**KAYATTA, Circuit Judge**.  Christopher Mullins appeals his conviction and sentence for conspiring to possess and distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846.  He presses three primary arguments on appeal: (1) the record lacks sufficient evidence to convict him of the charged conspiracy; (2) the district court plainly erred in instructing the jury on the conspiracy charge; and (3) the district court clearly erred in calculating the drug quantity attributable to Mullins.  Finding all three arguments unpersuasive, we affirm the conviction and the sentence in all respects.

## I.  Background

### A.  The Evidence

Because Mullins challenges the sufficiency of the evidence after a jury found him guilty, "we view the facts in the light most favorable to the verdict."  United States v. Adorno-Molina, No. 13-1065, 2014 WL 7234953, at *1 (1st Cir. Dec. 19, 2014).

In September 2011,  Maine Drug Enforcement Agency ("MDEA") agents investigated a drug trafficking organization operating out of 100 Ohio Street in Bangor, Maine.  The leaders of this organization shipped crack and powder cocaine from the New York City area to Maine via Greyhound bus.  As part of the

investigation, MDEA agents, using a confidential informant ("CI"),[1] conducted a controlled purchase of $350 worth of powder cocaine from Mullins. CI wore a "body wire" (an electronic transmitting device that transmits all audio within earshot). After CI arrived at Mullins's apartment, Mullins called the 100 Ohio Street organization. During the call, Mullins mentioned someone named "Bullet,"[2] a member of the organization.

Shortly after Mullins called, a green Lexus pulled up to his apartment. "Fish,"[3] another member of the organization, came inside Mullins's apartment. Mullins and Fish met alone for about two minutes, and then Fish left. Mullins then handed CI eight bags of powder cocaine. CI had purchased ten bags, but only received eight, because Mullins kept two as a fee.

Two months later, on November 2, 2011, MDEA agents arrested Mullins. On that same day, they searched 100 Ohio Street and an apartment located on Garland Street also used by the conspirators to store drugs, seizing approximately 368 grams of crack from the Garland Street location. After receiving Miranda

---

[1] We refer to the informant as CI only "in light of concerns about the safety of cooperating witnesses raised by the Committee on Court Administration and Case Management of the Judicial Conference of the United States." United States v. Etienne, 772 F.3d 907, 912 n.1 (1st Cir. 2014).

[2] Bullet's name is Jowenky Nunez.

[3] Fish's name is Manuel Trinidad-Acosta. See United States v. Trinidad-Acosta, 773 F.3d 298 (1st Cir. 2014).

warnings, Mullins provided MDEA agents with a recorded statement, during which he communicated the following: He started working for the members of the organization (to whom he referred as "the Dominicans") in November 2010. By June 2011, he had four or five customers to whom he regularly sold crack and powder cocaine. Mullins reported that he purchased from the Dominicans, on average, $5,000 worth of crack and powder cocaine per week, and, on occasion, as much as $5,000 in a single night.[4] He would resell the drugs for his own profit, either by taking some portion of the sale, as he did in the controlled purchase, or by reselling at a higher price. Mullins referred to himself as a "runner" for the Dominicans. He also said that there were times when customers would try to purchase drugs directly from the Dominicans, but the Dominicans would tell them, "no, go see Chris [Mullins]."

## B. Trial and Sentencing

A grand jury indicted Mullins for conspiring to possess with intent to distribute cocaine and more than 28 grams of cocaine base from September 2010 through November 2011. At trial, the key evidence against him was his own statement to the MDEA agents, the testimony of CI, and the testimony of Pari Proffitt, a roommate of the Dominicans. Proffitt testified that 90 percent of the sales made by the 100 Ohio Street organization were crack, and that

---

[4] Mullins claimed that he once spent approximately $50,000 in two months on drugs for personal use.

-4-

Mullins was a frequent purchaser. A law enforcement officer testified that a "runner" is "a middleman," a "go-between the larger dealer and the typical user." A jury convicted Mullins after the two-day trial.

At sentencing, the district court ultimately held Mullins responsible for 140 grams of crack. The court conservatively calculated that Mullins worked for his suppliers for only ten weeks, from June 2011 until the end of September 2011 (subtracting 6 weeks when he was out of town). The court found that he bought about $4,000 worth of drugs per week, 90 percent of which was crack. The court found that crack goes for approximately $200 a gram, and that Mullins kept 20 percent of the purchases for himself. The court did not hold Mullins accountable for the estimated 10 percent of his sales that were cocaine, because both parties agreed that it would have no effect on the applicable sentencing range. Based on a base offense level of 28 and criminal history category VI, the district court determined that the guideline sentencing range was 140-175 months. U.S.S.G. § 2D1.1(c); id. ch. 5, pt. A. The district court sentenced Mullins to 140 months in prison.

## II. Analysis

### A. Sufficiency of Evidence

Mullins contends that the evidence was so lacking that it at best showed he was a frequent purchaser of crack and cocaine--an

addict who independently resold drugs to sustain his habit. We review the denial of a motion for judgment of acquittal de novo. United States v. Rosado-Pérez, 605 F.3d 48, 52 (1st Cir. 2010). We draw all reasonable inferences in the prosecution's favor. Id. "If a reasonable jury could find [Mullins] guilty beyond a reasonable doubt of all elements of the charged offense, we must affirm the conviction." Id.

To establish guilt on a conspiracy charge, the government must prove that "an agreement existed to commit the underlying substantive offense, and that the defendant elected to join the agreement, intending that the underlying offense be committed." United States v. Gómez-Rosario, 418 F.3d 90, 105 (1st Cir. 2005) (internal quotation marks omitted). Mullins's own statement was more than enough to support a finding that he was, as he put it, a "runner" for the 100 Ohio Street organization, rather than just a user who independently resold drugs on his own. Mullins argues that his concession that he was a runner is "nebulous." Perhaps. But any ambiguity would seem to be irrelevant, since it matters only that he had a role in the conspiracy, and not that the role be some particular type of runner. Moreover, the remainder of Mullins's statement fleshed out further details that amply supported a finding that he was a member of the conspiracy that operated out of 100 Ohio Street: he obtained on average $5,000 worth of crack per week, and some of his retail customers were

-6-

referred to him by the organization leaders.  In short, he described himself in substance as a knowing and regular retail middleman for his suppliers.[5]  See United States v. Boidi, 568 F.3d 24, 29-30 (1st Cir. 2009) (continuing purchase and sale relationship along with upstream dealer's knowledge of defendant's redistribution permits a jury to infer agreement that defendant possess and distribute drugs to advance common conspiratorial goal); United States v. Moran, 984 F.2d 1299, 1303 (1st Cir. 1993). The details of the sale to CI, and evidence that Mullins called the organization's order number 116 times in four months added further substantial support for the jury's conclusion.  In short, the evidence was more than sufficient to support the verdict.[6]

---

[5]  In his pro se brief, Mullins also complains about the audio quality of his recorded statement, portions of which were played for the jury.  But the jury was able to evaluate that recording for itself, along with the interviewing officer's first-hand testimony about the content of that interview.

[6]  In his pro se brief, Mullins contends that evidence of drug type--crack or powder cocaine--was insufficient to support a conviction.  But, under the statute, the government need not prove any specific type of controlled substance. See 21 U.S.C. § 841(a) ("[I]t shall be unlawful for any person knowingly or intentionally (1) to . . . possess with intent to . . . distribute, or dispense, a controlled substance[.]"); see also United States v. Andino, 627 F.3d 41, 48 (2nd Cir. 2010) (noting that the government does not need to prove a "type-specific scienter on the defendant's part, as a result of alleging a conspiracy involving a specific type of drug").

**B.  Jury Instructions**

Mullins argues that the district court should have sua sponte provided additional jury instructions on "the principles of separate conspiracies."  Mullins failed to object below, so we review only for plain error.  United States v. Colon, 744 F.3d 752, 757 (1st Cir. 2014).  Plain error requires Mullins to meet a "heavy burden of showing (1) that an error occurred; (2) that was clear or obvious; (3) that the error affected his substantial rights; and (4) that the error also seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  Id. (internal quotation marks omitted).

Mullins is correct that a defendant charged with a conspiracy is entitled to an instruction that he must be convicted of the conspiracy charged, and not another conspiracy that might be supported by the evidence, whenever the evidence would support a finding of an illicit conspiracy other than the one charged.  United States v. Díaz, 670 F.3d 332, 350 (1st Cir. 2012).  But the district court did provide such an instruction.  In pertinent part, the district court instructed that:

> For you to find Mr. Mullins guilty of conspiracy, you must be convinced that the government has proved each of the following elements beyond a reasonable doubt: First, that the agreement specified in the indictment, and not some other agreement or agreements, existed between at least two people to distribute and to possess with intent to distribute cocaine and cocaine base;

> and, second, that the defendant willfully joined in that agreement.
>
> . . . .
>
> [T]he government must prove beyond a reasonable doubt that those who were involved shared a general understanding about the crime. Mere similarity of conduct among various people or the fact that they may have associated with each other or discussed common aims and interests does not necessarily establish proof of the existence of a conspiracy, but you may consider such factors.

An instruction like this has survived similar challenges. See United States v. Niemi, 579 F.3d 123, 126-27 (1st Cir. 2009); United States v. Balthazard, 360 F.3d 309, 316 (1st Cir. 2004). The instruction, as given, conveyed the substance of Mullins's defense. As such, his claim--especially on plain error review-- fails. See Niemi, 579 F.3d at 127.

## C.   Drug Quantity Calculation

The specific type of controlled substance does matter for purposes of applying the sentencing guidelines. See U.S.S.G. §2D1.1(c). In his pro se brief, Mullins argues that there was no basis for the district court's finding at sentencing that 90 percent of his dealings involved crack. Mullins points us to the controlled purchase, which involved only a small amount of powder cocaine, not crack.

We review a district court's factual findings regarding drug quantity for clear error. United States v. Green, 426 F.3d

64, 66 (1st Cir. 2005). Drug quantity findings may "be based on approximations . . . as long as those approximations represent reasoned estimates of drug quantity." United States v. Ventura, 353 F.3d 84, 88 (1st Cir. 2003). A defendant may be held responsible only for drug quantities "foreseeable to [that] individual." United States v. Correy, 570 F.3d 373, 380 (1st Cir. 2009). Foreseeability encompasses "not only . . . the drugs [the defendant] actually handled but also . . . the full amount of drugs that he could reasonably have anticipated would be within the ambit of the conspiracy." United States v. Santos, 357 F.3d 136, 140 (1st Cir. 2004).

The district court's finding here had substantial support in the record, and was thus not clearly erroneous: Proffitt testified that crack accounted for 90 percent of the conspirators' drug sales, and police seized 368 grams of crack when they searched the Garland Street apartment. Proffitt also testified that Mullins frequently purchased crack from Fish. To be sure, the drug quantity calculation here was imprecise. But Mullins could have been held accountable for "the full amount of drugs that he could reasonably have anticipated would be within the ambit" of the 100 Ohio Street conspiracy. Id. Instead, the court only held Mullins accountable for a very conservative estimate of the crack that he himself handled. Imprecise drug-quantity findings are upheld when they are "based upon conservative estimates or favorable

-10-

assumptions."   <u>United States</u> v. <u>Rodriguez</u>, 731 F.3d 20, 32 (1st
Cir. 2013).

## III.  Conclusion

For the foregoing reasons, we <u>affirm</u>.